[Cite as *State v. Barker*, 2014-Ohio-4131.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# PORTAGE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| | : | **CASE NO. 2013-P-0084** |
| - vs - | : | |
| ADRIAN A. BARKER, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Portage County Court of Common Pleas, Case No. 2009 CR 00688.

Judgment: Affirmed.

*Victor V. Vigluicci,* Portage County Prosecutor, and *Pamela J. Holder,* Assistant Prosecutor, 241 South Chestnut Street, Ravenna, OH 44266 (For Plaintiff-Appellee).

*David L. Doughten,* 4403 St. Clair Avenue, Cleveland, OH 44103-1125 (For Defendant-Appellant).

CYNTHIA WESTCOTT RICE, J.

{¶1} Appellant, Adrian A. Barker, appeals from his conviction, entered by the Portage County Court of Common Pleas, on one count of felony murder. For the reasons discussed in this opinion, we affirm the judgment of the trial court.

{¶2} On November 19, 2009, the Portage County Grand Jury indicted appellant for felonious assault, a felony of the second degree, in violation of R.C. 2903.11(A)(1), and obstructing official business, a felony of the fifth degree, in violation

of R.C. 2921.31. After Christopher Kernich, the victim in this matter, was pronounced dead, the grand jury filed a supplemental indictment charging appellant with two counts of murder in violation of R.C. 2903.02(A) and (B). Two additional misdemeanor assault charges were included in a supplemental indictment, filed February 26, 2010. The February supplemental indictment also included one count of tampering with evidence, a felony of the third degree, in violation of R.C. 2921.12(A)(1) and (B), and one count of obstructing justice, a felony of the third degree, in violation of R.C. 2921.32. In March 2010, the grand jury filed an additional amended supplemental indictment to reflect the certified date of Christopher Kernich's death.

{¶3} Appellant was tried and convicted on the charges of felonious assault, felony murder, murder, and tampering with evidence. The jury acquitted appellant on the assault charge (which pertained to an alleged attack on an individual separate from the victim in this matter). On May 26, 2010, the trial court determined that the two counts of murder merged for purposes of sentencing and that the felonious assault and felony murder charge were allied offenses of similar import. The trial court then sentenced appellant to life in prison with eligibility for parole following 15 years for the murder of Christopher Kernich and a concurrent term of five years imprisonment for tampering with evidence. The trial court additionally ordered appellant to pay restitution to Christopher Kernich's family for medical and funeral expenses.

{¶4} Appellant appealed and, in *State v. Barker*, 11th Dist. Portage No. 2010-P-0044, 2012-Ohio-522, this court affirmed the trial court's judgment as it related to appellant's conviction for tampering with evidence. This court further held, however, that the trial court did not apply the proper legal standard for determining whether lesser

2

included offense instructions were required. Because of this error, this court held appellant was entitled to a retrial for his convictions on felonious assault, felony murder, and murder. This court held, on retrial, the trial court was required to instruct the jury on assault, involuntary manslaughter, and reckless homicide, which were lesser included offenses of felonious assault, felony murder and murder, respectively. The matter was accordingly reversed and the matter remanded to the trial court for further proceedings.

{¶5} At appellant's retrial, many eyewitnesses testified. Although the accounts of the fight differed in certain respects, the witnesses for the state conveyed, for the most part, a similar rendition of the events they observed. A summary of the relevant eyewitness testimony is as follows:

{¶6} Christopher Pataky testified that he, Kernich, Chelko, and Clements had been out visiting various bars on November 14, 2009. He stated each member of their group had been drinking, but no one was excessively drunk. Pataky, who is 6'7" and 255 lbs, testified he consumed approximately eight beers over a four-to-five hour period; given his size, he testified, such a quantity of alcohol did not render him impaired.

{¶7} While walking home, Pataky testified he was nearly struck by a white Honda Civic leaving the parking lot of the Firestone station located on the corner of Deypeyster and East Main Streets in Kent, Ohio. Pataky testified he yelled at the vehicle's occupants, complaining the car nearly struck the group. According to Pataky, the car stopped further down East Main and parked in a driveway. Pataky testified the group continued down the street; he and Clements in front of Kernich and Chelko. Pataky stated he and Clements passed the car without incident; after passing the vehicle, however, he turned around and observed Chelko on the ground adjacent to the

3

white Civic. Pataky noticed that Kernich, who was 6'3" and approximately 200 lbs, in the street with Kelly, 5'10" and 235 lbs.

{¶8}   Pataky rushed to assist Chelko and, after confirming Chelko was fine, Pataky looked out to the street and witnessed appellant, 6'0" and approximately 180 lbs, and Kelly stomping on Kernich's head. Pataky testified they looked as if they were enjoying it.  Pataky testified he then ran toward appellant and pushed him away from the unresponsive Kernich.  According to Pataky, after being shoved, appellant punched him in the lip and fled the scene.  Overall, Pataky testified he witnessed appellant stomp Kernich two or three times.

{¶9}   Bradley Chelko, Kernich's roommate, similarly testified that as he and his friends were walking down East Main, a white Honda came out of a parking lot and almost hit the group. The car parked up the street and as he attempted to pass by, Kelly pushed him into the vehicle then punched him in the face.  Chelko fell back but, as he stood up, Chelko stated he took a swing at Kelly but missed.   Chelko was subsequently struck in the head a second time.  From this blow, he fell to the ground.  When Chelko looked up, he noticed Kernich was in the street "squaring up" with Kelly. Chelko testified he then saw appellant charge Kernich and strike him with a running punch. Kernich fell immediately and, according to Chelko, both appellant and Kelly began kicking Kernich in the head and abdomen. Chelko stated he had consumed approximately five or six beers over the course of the night, but was able to recall the events of the night "clearly." Approximately 20 minutes after the assault, Chelko later identified each assailant for police during a show-up identification.

4

**{¶10}** Dave Clements, Kernich's close friend and fellow student at Kent State, stated he had consumed between seven and eight beers over the course of the evening. Similar to Pataky and Chelko, Clements testified that the white Honda nearly hit him and his friends, after which, words were exchanged. He stated that he and Pataky had passed the vehicle up the street without incident; when he turned around to see where Kernich and Chelko were, however, he witnessed Chelko being pushed into the vehicle and subsequently punched by a black male later identified as Kelly. After Chelko was hit, Clements stated Kernich and Kelly "squared up" in the street. Suddenly, Clements saw appellant run into the street, and blind-sided Kernich with a punch to the head that "had a lot of power behind it." After Kernich fell, Clements testified he witnessed appellant stomp on Kernich's head.

**{¶11}** Clements stated he was five feet away from appellant at the time of the assault. He testified he was 100 percent certain appellant stomped on Kernich's head twice. After the stomping, Clements testified he heard Kelly yelling at the surrounding crowd. As Kelly retreated, Clements testified he followed Kelly and shouted at him as he left. According to Clements, Kelly ultimately turned and punched Clements in the face. Clements later identified appellant and Kelly at a show-up identification approximately 20 minutes after the incident. He testified he did not see the men in handcuffs or in a police cruiser but, given the police presence, he knew they were being detained.

**{¶12}** On cross-examination, Clements admitted that he was unable to say with certainty that the individual who punched Kernich was white or black. Nevertheless, at

trial, he testified that there was no doubt in his mind that appellant was the individual who had blind-sided and stomped on Kernich.

{¶13} Thomas Coleman, a Kent State student who also worked Kent State campus security, testified he was on the porch of a fraternity house when he observed two black males accost a white male in the street. He testified he was approximately 50 feet from the incident, and he saw a black male in a red shirt yelling at the white male. According to Coleman, the white male did not appear interested in fighting because he had his hands at his side and appeared to be walking away from the encounter. Coleman testified, however, that a black male in a white shirt suddenly sucker-punched the white male from behind. The punch was very forceful and struck the white male in the head. Coleman witnessed the white male collapse and hit his head on the pavement. Coleman could hear the thud of the victim's head hit the street and analogized the sound to "dropping a bowling ball."

{¶14} Coleman approached the scene and witnessed appellant kicking the victim in the head using a "soccer ball kick." By the time he reached the fight, Coleman testified he was "face-to-face, like, within arm's reach" from appellant and Kelly. Coleman, who had approximately six cans of beer over the course of the night, later identified appellant and Kelly by photographs first published in a local newspaper several days after the assault.

{¶15} Charles Johansen, another Kent State student, testified he was walking home after consuming three or four beers over the course of the evening. As he made his way down East Main Street, Johansen noticed a heated argument occurring between several individuals. Johansen testified he observed a taller white male and a

6

dark-skinned black male break away from the group, "squaring up" with one another. He testified a different black male charged the white male and struck the white male with an overhand punch to the side of the head. The white male collapsed to the ground and, according to Johansen, the black male who struck the victim stomped or kicked the latter twice in the vicinity of his head. Between 10 and 15 minutes after the assault, Johansen, through a show-up identification procedure, identified appellant as the individual who threw the punch and subsequently stomped the victim. Johansen testified he was aware appellant was being detained by police at the time of the show-up.

{¶16} Megan Prescott, also a student at Kent State and friend of Kernich, was with friends and fellow students Ali Gantz and Kerra Coticchia on the night of the incident. The young women were at a local bar until they left at approximately 2:00 a.m. Prescott testified she consumed three drinks over a four-hour period. As the girls were walking home, Prescott saw Kernich walking with some friends. Kernich acknowledged her, shouting, "[H]i, Prescott."

{¶17} After passing Kernich and his friends, Prescott testified she witnessed a white car abruptly pull into a driveway. Prescott testified she observed two black males yelling obscenities, then observed an individual fall against the vehicle. She stated she saw Kernich in the street in a boxing stance with appellant and Kelly. Appellant then approached Kernich from behind and punched him in the side of the head. According to Prescott, Kernich never saw the punch coming. She stated the punch was delivered with "a lot of force."

7

{¶18} After Kernich fell, Prescott, who was approximately 10 to 15 feet from the incident, testified appellant and Kelly began kicking the side of Kernich's head like a "soccer ball." Prescott stated she heard appellant exclaim "that's what you get" as he and Kelly were beating the unconscious Kernich. Prescott was able to identify the clothing each assailant was wearing and identified appellant as the individual who first hit Kernich.

{¶19} Ali Gantz was with Prescott and Coticchia that night and was also a friend of Kernich. She testified she had been out that night and consumed approximately three drinks over the course of the evening. According to Gantz, as the girls were walking home, she witnessed one of Kernich's friends, with whom she was unfamiliar, being pushed into a white Honda. She testified she then saw Kernich in the street with a dark-skinned African American male, later identified as Kelly. The two men were in boxing stances with their hands up. Gantz testified appellant suddenly charged Kernich and with a "leap punch" struck Kernich in the head. According to Gantz, Kernich did not see it coming and the force of the blow rendered him completely unconscious. She then witnessed appellant kick Kernich several times in the torso "like a kickball." Gantz testified she did not recall witnessing Kelly kick Kernich after he fell. Gantz testified there was no doubt in her mind that appellant was the individual who punched Kernich in the head and that appellant kicked Kernich after he was down.

{¶20} Robert Clouden, a student at Kent State and risk manager for the fraternity throwing the party attended by Coleman, also witnessed a portion of the incident. Clouden testified he was inside the fraternity house when he heard people yelling "Fight. Fight. Fight." Clouden testified he went outside and observed a light-

8

skinned, black male wearing a white t-shirt stomping on an unconscious individual's head between three and four times. Clouden left the porch and approached the scene. He testified he came within arm's length of the attacker, who he later identified as appellant. Clouden did not see Kelly involved in the fight. Clouden testified he had only two Bud Lights over the course of the entire evening. Similar to Thomas Coleman, Clouden also identified appellant via the photograph that appeared in the newspaper.

{¶21} On the night of the assault, Wilson Kuzyk was with his friends Robert Clouden and Thomas Coleman at the above-mentioned fraternity party. Kuzyk testified he was on the porch of the house, approximately 35 to 40 feet from the street, when he observed a light-skinned individual wearing a white V-neck t-shirt, later identified as appellant, and a stockier black male in a red V-neck t-shirt, later identified as Kelly, stomping the head of an unconscious male. Kuzyk approached the scene and eventually was within "arms length" of appellant. Then, a white vehicle with its headlights off swerved into the road. According to Kuzyk, Kelly entered the vehicle and attempted to pull appellant into the same; appellant, however, did not enter the car. As the vehicle drove away, Kuzyk testified appellant was aggressively challenging individuals in the crowd to fight him.

{¶22} Anthony Gallas, another Kent State student, testified he was with his friends, Tyler Martin and Jared Bartholomew, on the night of the incident. The three young men had spent the evening at several bars where Gallas had between eight and ten beers over a four-hour period. As they were walking home, Gallas witnessed the fight in its entirety. Gallas testified he was about 25 feet away when he saw a white male in a black shirt, later identified as Kernich, and a black male in a red shirt, later

9

identified as Kelly, in the middle of the street, "squaring off." He testified that a second black male in a white V-neck shirt, later identified as appellant, charged the white male at a "15-yard sprint" and punched him in the side of the head knocking the white male out immediately. According to Gallas, the victim was blind-sided by the blow. As the victim collapsed, Gallas noted, his head bounced off the pavement. Once the victim fell, Gallas testified that Kelly then proceeded to kick him in the top of the head while appellant simultaneously stomped on the victim's head and chest "violently." After the assault, Gallas testified a white car, driven by a white male, later identified as Jefferson, pulled up and either Kelly, appellant, or both entered the vehicle. Gallas identified both appellant and Kelly at the subsequent show-up identification. He further testified he was 100 percent certain appellant was the individual who punched and stomped Kernich.

{¶23} Gallas additionally testified he witnessed Jefferson apparently exit the car and deliver a final kick to Kernich. On cross-examination, Gallas admitted he never provided this information in any prior statement.

{¶24} Tyler Martin testified that, on the night in question, he had six drinks over the course of a three-hour period while out with his friends, Gallas and Bartholomew. As the three young men walked down East Main Street on their way home, Martin testified he witnessed a black male in a red, short-sleeved t-shirt, later identified as Kelly, "squared off" with a white male, later identified as Kernich. He then saw a second, lighter-skinned black male in a white V-neck shirt, later identified as appellant, charge Kernich at a 15-yard sprint and sucker punch Kernich from behind. Martin testified the victim was knocked out immediately and, as he fell, his head bounced off the concrete.

10

{¶25} Once the victim hit the ground, Martin testified appellant and Kelly began violently kicking and stomping Kernich. Martin testified appellant delivered three to four kicks to the helpless Kernich. After the attack, Martin testified appellant appeared to be almost celebrating "like he had just won something." Appellant further threatened Martin as well as other bystanders, shouting "yeah, we killed that n-----. Yeah, yeah, we'll kill you, too, n-----." Martin testified appellant showed "no remorse at all." Subsequently, Martin began recording appellant and Kelly with his cell phone. While the recording is highly pixelated, some audio can be discerned. As appellant and Kelly depart from the scene, Martin shouts "congratulations, you're going to jail." A voice can be heard advising "I'm getting the fuck out of here" to which Martin replies "Don't worry, you're about to get locked up."

{¶26} By the end of the assault, Martin testified he was within seven feet of the assailants and was 100 percent certain appellant and Kelly were the attackers. Martin immediately sought out police to give a statement and provide identification of the attackers. Officer Sarah Berkey, the first responding officer, testified Martin approached her, very upset, and, while pointing to appellant and Kelly, told the officer "don't let them leave." On cross-examination, Martin admitted he did not see well at night because he is blind in his left eye, as well as color blind.

{¶27} Glenn Jefferson, a sophomore at the University of Akron and Ronald Kelly's roommate, testified appellant and Kelly asked him to go to a party with them at Kent State on the night of November 14, 2009. He declined, but later changed his mind. Jefferson arrived at Kent at approximately 12:00 a.m. where he met appellant and Kelly at a fraternity house. The trio drank and danced until approximately 2:00 a.m.,

11

when they left. Upon leaving the party, Jefferson testified the three young men entered his white Honda Civic. According to Jefferson, someone outside the vehicle yelled some unfriendly words at him and his companions. Jefferson testified Kelly ordered him to pull over. Once the car stopped, Kelly and appellant leapt out of the vehicle.

{¶28} As Jefferson exited, he testified he was then accosted by an unknown male. According to Jefferson, the unidentified male took a swing at him; Jefferson ducked and countered with a punch, which connected; as his alleged attacker fell back, Jefferson testified he kicked the unidentified male in the stomach to keep him away. After kicking his purported attacker, Jefferson testified he looked up and saw "[Kelly] and [appellant] stomping some guy in the head * * *." Jefferson testified he specifically witnessed Kelly stomp on the victim's head twice and appellant stomp on the victim's head once. Jefferson returned to his vehicle, ripped off his temporary tag to avoid being identified, and returned to the scene to pick up his companions. Kelly jumped in the car, but, according to Jefferson, appellant had left the immediate area. As Jefferson and Kelly drove up the street, they saw appellant in the parking lot of a local auto service business surrounded by three or four individuals. Jefferson testified he and Kelly exited the vehicle attempting to retrieve appellant; they were unable to get appellant in the vehicle and, shortly thereafter, the police arrived and surrounded Jefferson, Kelly, and appellant in the parking lot.

{¶29} During his testimony, Jefferson admitted he lied to police throughout the course of the investigation to cover for his companions; he initially told police the fight was a result of a group of people threatening the three young men and casting racial

12

slurs at appellant and Kelly. He recanted these statements and, at trial, testified that, despite his numerous fabrications, he was being truthful in his testimony at trial.

{¶30} After the prosecution rested, the defense put several witnesses on the stand whose statements contradicted the foregoing general rendition of events. First, Danielle Contradi, a Kent State student at the time of the assault, testified she provided an initial statement to police that a white male struck the victim in the head; she also stated she only saw Kelly kicking the victim while he was on the ground. On cross-examination, Contradi testified, that she did not get a good look at the assailant because she was focusing on Kernich. She further testified her statement was based upon her perception that the attacker *looked* white because Kelly's skin color was significantly darker than the person who punched the victim from behind. Contradi added that she knew the individual who struck the victim had dark hair, not red hair; thus, she specifically excluded Jefferson as the potential suspect at the time she made the statement.

{¶31} Joseph Starkey testified he witnessed Kelly and Kernich in the road as though they were going to fight. He stated he observed a taller African American, later identified as appellant, come up behind Kernich and suddenly Kernich collapsed. He testified, however, he did not observe appellant throw a punch. And, upon collapsing, Starkey testified he witnessed only Kelly kicking and stomping Kernich.

{¶32} Jared Bartholomew testified he was with Gallas and Martin on the evening in question and was also a witness to the incident. In his statement to police, however, Bartholomew identified Kelly as the individual who punched Kernich and identified a

13

light-skinned male as the only party who kicked the victim. Bartholomew later identified the "light-skinned male" as appellant.

{¶33} Carl Belfiore, another Kent State student, gave a written statement in which he asserted that, while a white male and an African-American male were squared up in the street, a different white male charged and knocked out the first white male. He further stated the African-American male proceeded to kick the unresponsive white male. Belfiore stated he never witnessed the individual who knocked the white male out throw a kick. Belfiore later identified appellant as the individual who threw the knock-out punch. Belfiore testified that, despite the potential conflicts in his statements, his identification of appellant as a white male was based upon his light complexion relative to Kelly. And, after seeing appellant's picture, Belfiore testified he was certain appellant was the attacker.

{¶34} Jacquelyne Slicker, another student at Kent State, testified she was approximately 75 feet from the incident when it occurred. In a statement to police, she asserted the individual who struck the victim was a white male, with dirty-blonde hair. Jefferson was the first individual she saw upon speaking with police, and she immediately identified him as the assailant. She testified, however, after observing appellant at the scene, she began to question her own identification. Slicker ultimately testified that she did not want to recant on her original identification but, after considering what she witnessed, she recognized she could not positively identify the individual who threw the initial punch. Slicker further testified that Kelly was the only individual she witnessed kicking the victim.

{¶35} In addition to the foregoing eyewitness testimony, DNA evidence was taken from blood stains found on appellant's shirt and shoe. Sergeant Edward Wheeler, of the Kent Police Department, testified he arrived on the scene approximately two minutes after receiving the call; he later took appellant to the police station. In the course of his interviewing appellant, Wheeler observed what appeared to be blood on appellant's shirt, which appellant could not explain. Also, after appellant was arrested, a video taken while he was in custody depicted appellant licking his thumb and wiping the side of his shoe. The shirt and shoe were collected by police and analyzed by forensic scientists at BCI and a separate, private DNA laboratory.

{¶36} At trial, Chad Britton, a forensic scientist at BCI, testified he tested and analyzed the items. Britton concluded six stains on appellant's shirt tested presumptively positive for blood; similarly, appellant's shoe tested presumptively positive for blood on the heel. Linda Eveleth, a forensic scientist at BCI's DNA division, performed the next series of tests and issued a report concluding that a major DNA profile could be taken from two of the six stains. That major profile was consistent with the victim's DNA. And, according to Eveleth, the expected frequency of occurrence of this major profile is one in 24 quintillion, 930 quadrillion unrelated individuals; a number that is "billions times the world's population."

{¶37} Further, DeWayne Winston, a forensic scientist in the Forensic Identity Department at Laboratory Corporation of America, testified he received a DNA swab sample from BCI that was taken from appellant's shoe. And, after testing the sample, a DNA profile was developed that could not exclude the victim. According to Winston, the probability of finding another individual in the general population that had the same DNA

15

profile obtained from appellant's shoe is one in greater than six billion, 500 million, a figure greater than the earth's 2010 population.

{¶38} Finally, Dr. George Sterbenz, a forensic pathologist for the Summit County Medical Examiner, testified he conducted the autopsy on the victim. Dr. Sterbenz testified he reviewed the victim's treatment history from the reports of the first responders on the scene of the assault, to the hospital medical records relating to the victim's death. In light of this history, the doctor conducted a physical examination of the victim. In the course of the examination, the doctor documented the victim had a scalp laceration and a larger abrasion to the back of his head. The victim further had deep muscular bruising to the temporalis muscle, the muscle that attaches to the jaw and assists the jaw in closing. The doctor testified the victim also suffered a non-displaced skull fracture on the left side of his head; multiple skull bruises; subdural hemorrhaging; bruising and bleeding within the brain; and traumatic swelling of the brain. According to the doctor, the swelling of the brain caused it to be squeezed inside the cranial cavity. This condition, he testified, is referred to as brain herniation, which occurs when portions of the brain are pushed up against membranes and openings inside the cranial cavity.

{¶39} The doctor explained to the jury that the victim's treatment history and injuries indicated the victim's brain began to swell immediately after the assault and, because of the severity of the beating, he failed to improve regardless of medical treatment. The continued herniation of the victim's brain disrupted blood flow, which quickly compromised the brain tissue causing individual brain cells to die. Eventually, blood was no longer entering or leaving the brain, which resulted in death based on

16

neurologic criteria. The doctor concluded that the specific cause of death was cranial-cerebral blunt force trauma by homicide from being struck by another person or persons. The doctor testified the victim suffered concussive trauma to his skull and brain due a combination of multiple blows to his head. In particular, the doctor testified the victim suffered a fall, evidenced by his contrecoup pattern contusions to his brain, and sustained multiple blows to the head, and the cumulative effects of the trauma was the proximate cause of his death.

{¶40} After hearing the evidence, the jury returned a verdict on both counts of murder and the count of felonious assault. The trial court found the felonious assault and felony-murder counts were allied offenses of similar import and that the two counts of murder merged for purposes of sentencing. The state elected sentencing on the felony-murder count. Appellant was subsequently sentenced to life in prison with eligibility for parole after fifteen years and ordered the sentence to be served concurrently with the prison term he was already serving.

{¶41} Appellant appeals his conviction and assigns five errors for this court's review. His first assignment of error provides:

{¶42} "The trial court erred by restricting the cross-examination of state witnesses regarding the identification procedures failure to meet the guidelines of R.C. 2933.83(B) in violation of the confrontation clauses of the state and federal constitution."

{¶43} Under this assigned error, appellant argues the trial court unfairly restricted his ability to challenge Kent police officers' identification procedures relating to the various show-up identifications that occurred on the night of the assault. Appellant contends counsel should have been permitted to cross-examine police pursuant to

17

procedures set forth under R.C. 2933.83, the statute providing guidelines for police in the context of live lineup and photo lineup identifications, he was denied his right to confrontation. We do not agree.

**{¶44}** R.C. 2933.83 "requires any law enforcement agency or criminal justice entity that conducts live lineups and photo lineups to adopt specific procedures for conducting the lineups." *State v. Ruff*, 1st Dist. Hamilton No. C-110250, 2012-Ohio-1910, ¶5. The procedures include, inter alia, using "a blind or blinded administrator" who does not know the identity of the suspect to conduct a physical live lineup or a photo lineup. R.C. 2933.83(B)(1).

**{¶45}** Initially, because R.C. 2933.83 governs photograph and live lineup procedures, it does not specifically apply to individual show-up identification procedures that occur shortly after a crime and take place at or near the scene of that crime. *See State v. Pressley*, 2d Dist. Montgomery No. 24852, 2012-Ohio-4083, ¶33 (holding R.C. 2933.83 is not applicable to show up identification procedures).

**{¶46}** Moreover, the statute became effective *after* the crimes in this case were committed, on July 6, 2010. Because the requirements of R.C. 2933.83 were neither effective at the time of the crime, nor applicable to the procedure employed by the Kent police, they were irrelevant to the matter sub judice.

**{¶47}** The jury heard testimony from Officer Benjamin Darrah that the Kent Police Department had no specific policies or guidelines on how officers should conduct show-up identifications. It further heard testimony from Johansen, Chelko, and Clements relating to their show-up identification of appellant. These witnesses stated appellant was clearly detained at the time of the show-up. In light of the lack of defined

18

procedural protocol, the jury was able to consider the suggestiveness of the show-ups in its deliberations. We therefore conclude appellant's right to confrontation was fairly preserved and the court's disallowance of an inapplicable statute to further attack the weight and reliability of the identifications was a sound exercise of its discretion.

{¶48} Appellant's first assignment of error is without merit.

{¶49} We shall next consider appellant's fifth assignment of error, which provides:

{¶50} "The verdicts are against the weight of the evidence."

{¶51} "In determining whether the verdict was against the manifest weight of the evidence, '* * * the court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"(Emphasis sic.) *State v. Schlee*, 11th Dist. Lake No. 93-L-082, 1994 Ohio App. LEXIS 5862, *14-*15 (Dec. 23, 1994).

{¶52} A judgment of a trial court should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶53} Appellant contends inconsistencies in witness testimony militate heavily against his conviction. As a result, he contends the jury lost its way necessitating a reversal of his conviction.

19

**{¶54}** The jury found appellant guilty of both counts of murder and one count of felonious assault. And the court found that the two murders merged and the felonious assault merged with the felony murder. The state elected for appellant to be sentenced for felony murder. We hold appellant's conviction for felony murder is consistent with the manifest weight of the evidence.

**{¶55}** R.C. 2903.02(B) provides:

**{¶56}** "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree."

**{¶57}** R.C. 2903.11(A)(1) provides:

**{¶58}** "(A) No person shall knowingly do either of the following:

**{¶59}** "(1) Cause serious physical harm to another or to another's unborn;"

**{¶60}** Despite appellant's assertions, the jury heard evidence from multiple eye witnesses, the great balance of whom provided a remarkably consistent version of events. Ten witnesses (Thomas Coleman, Charles Johansen, Dave Clements, Bradley Chelko, Megan Prescott, Ali Ganz, Robert Clouden, Anthony Gallas, Tyler Martin, and Glenn Jefferson) testified at trial that they observed a thinner, light-skinned African-American male, wearing a white V-necked t-shirt charge and punch Kernich and subsequently stomp or kick the unconscious victim one or more times. Each of these witnesses ultimately identified appellant as the assailant committing these assaults. Furthermore, another witness, Christopher Pataky, testified that, while he did not see the initial blow that knocked Kernich to the ground, he did observe appellant stomp Kernich's head two to three times. Similarly, Wilson Kuzyk stated he observed

20

appellant violently stomping on Kernich's head multiple times. And, although Jared Bartholomew testified Kelly threw the initial punch, he also testified he witnessed appellant kicking Kernich while he was on the ground.

{¶61} Although appellant produced several witnesses who originally gave statements that a white male punched Kernich, two of these witnesses (Danielle Contradi and Carl Bellfirore) later clarified that their original statements, identifying a white male as the assailant, were premised upon their perception that appellant appeared white in comparison to Kelly. A third witness, Jessica Slicker testified she observed a white male with dirty blonde hair throw the initial punch; on cross examination, however, she stated she could not positively identify the initial assailant.

{¶62} Finally, Dr. Sterbenz testified that Kernich's death was proximately caused by the cumulative effect of blunt force trauma inflicted by the initial punch, Kernich's head striking the pavement, and the subsequent kicks or stomps, inflicted by both appellant and Kelly, to Kernich's head.

{¶63} Viewed in its totality, the evidence supports the reasonable inference that appellant, through a felonious assault, a felony of the second degree, proximately caused Kernich's death. We therefore hold the jury neither lost its way nor committed a manifest miscarriage of justice when it returned its verdict finding appellant guilty, beyond a reasonable doubt, of felony murder.

{¶64} Appellant's fifth assignment of error is without merit.

{¶65} We shall next consider appellant's second assignment of error, which asserts:

21

**{¶66}** "The trial court erred by permitting the prosecution to introduce prejudicially irrelevant testimony into evidence."

**{¶67}** Appellant contends the trial court committed reversible error when it permitted the jury to consider irrelevant photographs of injuries to two witnesses that had nothing to do with the crimes charged. He further contends the court similarly erred when it permitted a police officer to explain a video of appellant at the police station instead of allowing the trier of fact to draw its own conclusions relating to the video's content. We do not agree.

**{¶68}** The admission or exclusion of relevant evidence lies within the broad discretion of a trial court, and a reviewing court should not disturb evidentiary decisions save an abuse of discretion that has created material prejudice. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, ¶43, citing *State v. Issa*, 93 Ohio St.3d 49, 64 (2001). The phrase "abuse of discretion" connotes a lack of sound, reasonable, and legal decision-making. *State v. Metter*, 11th Dist. Lake No. 2012-L-029, 2013-Ohio-2039, ¶45; *see also State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶64.

**{¶69}** Unless otherwise prohibited, evidence is relevant and consequently admissible if it tends to make a consequential fact more or less probable. Evid.R. 401 and Evid.R. 402. A trial court, however, must exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403; *State v. Tate*, 11th Dist. Lake No. 2010-L-145, 2011-Ohio-6848, ¶44.

**{¶70}** We emphasize that "[u]nfavorable evidence is not equivalent to unfairly prejudicial evidence." *State v. Bowman*, 144 Ohio App.3d 179, 185, (12th Dist.2001).

Moreover, excluding evidence on the basis of "unfair prejudice" requires more than a balance of mere prejudice; otherwise, any admission adversely affecting a defendant's case would be excludable pursuant to Evid.R. 403. *State v. Crotts*, 104 Ohio St.3d 432, 437, 2004-Ohio-6550. Significant emphasis must therefore be placed upon the word "unfair." *Id.*

{¶71} A defendant may suffer unfair prejudice when the admission of evidence could result in an improper basis for the jury's verdict. *Tate*, *supra* at ¶50, citing *State v. Broadnax*, 2d Dist. Montogomery No. 18169, 2001 Ohio App. LEXIS 564, *8, (Feb. 16, 2001). "'The underlying premise of the Rule is that certain relevant evidence should not be admitted to the trier of fact where the admission would have an adverse impact upon the effectiveness or integrity of the fact finding process.'" *Id.,* quoting Weissenberger's Ohio Evidence, Treatise, Section 403.1, at 81-82. Accordingly, courts have held "evidence that tends to arouse a jury's emotions, evoke, in the jury, a sense of horror, or rouses an instinct to punish, may be considered 'unfairly prejudicial.'" *Tate*, *supra*, citing *Crotts*, *supra*; *see also State v. Norman*, 4th Dist. Ross Nos. 08CA3059 and 08CA3066, 2009-Ohio-5458, ¶54; *State v. Harris*, 7th Dist. Jefferson No. 04 JE-44, 2006-Ohio-3520, ¶91; *State v. Lloyd,* 2d Dist. Montgomery No. 15927, 1999 Ohio App. LEXIS 1256, *39 (Mar. 31, 1999).

{¶72} Appellant asserts that the evidence in question was either irrelevant or its relevance was substantially outweighed by the danger of its unfairly prejudicial effect. We shall first address the photographs. The photos at issue depict injuries Pataky sustained to his lip after Barker punched him, as well as injuries Chelko sustained to his head and chin when he was struck, by either Kelly, Jefferson, or both. The photos were

23

introduced pursuant to each witness' testimony regarding their rendition of what occurred.

{¶73} The photos were not directly relevant to the crimes with which appellant was charged. In this respect, the photos were irrelevant because they do not tend to establish a fact of consequence. Notwithstanding this point, the photos could be deemed relevant insofar as they tend to buttress Pataky's and Chelko's testimony regarding what they observed from their very unique perspective of the assault. Utilizing extrinsic evidence for this purpose, however, is prohibited by the rules of evidence.

{¶74} Evid.R. 608(B) provides:

{¶75} Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of crime as provided in Evid.R. 609, may not be proved by extrinsic evidence.

{¶76} It appears the photos were relevant only to the extent they supported Pataky's and Chelko's credibility or character for truthfulness. Evid.R. 608(B), however, prohibits the use of extrinsic evidence for this purpose, regardless of its potential relevance. The trial court consequently erred in admitting the photos over objection.

{¶77} Even though the trial court erred in admitting the photos, appellant suffered no prejudice from their introduction. As discussed under appellant's fifth assignment of error, the evidence in this case, viewed in its totality, militated heavily in favor of a conviction. As a result, any error in admitting the photos of Pataky's and Chelko's coincidental injuries was rendered harmless.

{¶78} Next, appellant asserts he suffered prejudice when Lieutenant James Ray Stein was permitted to comment on a portion of the booking video in which appellant is seen removing something from his shoe. Appellant contends the content of the video was sufficient, unto itself, for the jury to consider and Lieutenant Stein's opinions encroached upon the jury's role as factfinder. We do not agree.

{¶79} Evid.R. 701 provides: "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

{¶80} At the time of the crimes, Lieutenant Stein, a 32-year veteran of the Kent Police Department, was in charge of the detective bureau. Prior to observing the booking video, Sergeant Ed Wheeler had pointed out to Lieutenant Stein that appellant had blood on his hands. And, in the course of his experience as a police officer, Lieutenant Stein testified it is not uncommon for arrestees to try and discard evidence before they are processed. In the case of blood evidence, he testified, "they may try to wipe off their hands, if they were involved in an assault case or something like that." With this in mind, the lieutenant testified: "I knew this was a felonious assault and there was blood and it involved kicking and stomping of the victim. Blood will transfer from one individual to another individual."

{¶81} After the video was played without commentary, it was re-played to allow the lieutenant to comment. In doing so, the lieutenant observed:

25

{¶82} Now [appellant] picked up one of his shoes. He's looking at both sides of the shoe, decides to put them on. He looks at the - - that shoe, also. He licks his thumb. And now he's wiping the side of his shoe off; takes his other thumb and does that same thing on the other shoe, too.

{¶83} * * *

{¶84} [Appellant is] looking at his hands right now. Sergeant Wheeler had pointed out to him and asked him about the blood on his hands, and he appears to be picking at his right hand. It's hard to see what he's doing, but, whatever he's picking off, he's trying to throw into the trash can that's in the corner.

{¶85} The state laid an adequate foundation for the introduction of Lieutenant Stein's opinion testimony as it related to what was occurring on the video pursuant to Evid.R. 701. To wit: the lieutenant's narration was based upon his perception of appellant and helpful to establish a clear understanding of his testimony vis-à-vis appellant's behavior in the booking video. We therefore conclude Lieutenant Stein's testimony was relevant and did not encroach upon the province of the jury.

{¶86} Appellant's second assignment of error is without merit.

{¶87} Appellant's third assignment of error provides:

{¶88} "The trial court erred by permitting the prosecution to introduce prejudicially irrelevant testimony into evidence in violation of Evid.R. 404(B)."

{¶89} Under this assignment of error, appellant argues the trial court committed reversible error when it permitted the state to introduce evidence, by way of the booking

26

video, that appellant was charged with a crime for which he was not on trial, namely, obstructing official business. Appellant contends such "other acts" evidence was prohibited because it suggested appellant had a propensity for criminal activity independent of the offenses for which he was charged. Appellant maintains allowing the jury to consider the irrelevant evidence that he was charged with an additional crime compromised his constitutional right to due process. We do not agree.

{¶90} We first point out that the evidence upon which the obstruction charge was based involved the multiple inconsistent statements appellant had provided police.[1] This evidence was introduced by way of Sergeant Wheeler's testimony before the booking video was played. The video depicts an officer who, after advising appellant that he would be charged with felonious assault and obstruction, explains that police were provided with numerous witness statements directly implicating appellant in the assault; the officer further explained that appellant had given investigators three different versions of events which indicated, in light of the eye-witness' statements, he was misleading or deceiving investigators. The fact that appellant was offering different accounts of what occurred, the basis of the obstruction charge, was cumulative of evidence previously introduced. Hence, the portion of the video in which appellant is apprised of the obstruction charge is relevant and admissible. The question, therefore, is whether the mere mention that appellant would be formally charged with the obstruction charge, a crime for which he was not on trial, was inadmissible.

---

1. Appellant, in his brief, asserts the video was played for the purpose of arguing that appellant tried to hide evidence by way of wiping blood off of his shoe. He further suggests that this was the basis for the obstruction charge. A review of the relevant portions of the video, however, demonstrates the obstruction charge was premised upon the investigator's belief that he was lying to police by virtue of his various inconsistent statements. Even assuming the charge was premised upon the act of blood wiping, those acts would be relevant to the extent it provides some evidence of guilt vis-à-vis the principle assault.

27

**{¶91}** We acknowledge that the statement regarding the charge for obstruction is not obviously relevant to the charges appellant was facing. Nevertheless, it is clear that the statement came in to emphasize (1) appellant had been positively identified as a participant in the assault; and (2) in light of the eye-witnesses' identification, the police concluded his inconsistent statements were fabrications. In this respect, the introduction of the statement was for a purpose *other than* to establish a propensity or disposition on the accused's part to commit a crime. *State v. Roe*, 41 Ohio St.3d 18, 24 (1989). The Supreme Court of Ohio has held that "'evidence of other crimes may be presented when "they are so blended or connected with the one on trial as that proof of one incidentally involves the other; or explains the circumstances thereof; or tends logically to prove any element of the crime charged."'" *State v. Wilkinson*, 64 Ohio St.2d 308, 317 (1980), quoting *United States v. Turner*, 423 F.2d 481, 483-484 (7th Cir.1970); *accord Roe*, *supra*.

**{¶92}** Here, the evidence upon which the obstruction charge was founded was also crucial to the state's evidence in the underlying murder case. In this regard, the crime of obstruction is significantly connected with the murder and felonious assault charges such that the basis for the former incidentally forms a foundation for establishing appellant's involvement in each of the latter. In this respect, we discern no error in the court's decision to permit the statement and deny appellant's request for a mistrial.

**{¶93}** Even assuming, however, the statement should have been excluded, we conclude, in light of the surrounding circumstances and the evidence submitted to support appellant's involvement, any error in admitting it was harmless.

**{¶94}** Admission of improper irrelevant evidence is harmless if "the remaining evidence alone comprises 'overwhelming' proof of defendant's guilt." *State v. Williams*, 6 Ohio St.3d 281, 290 (1983), quoting *Harrington v. California*, 395 U.S. 250, 254 (1969). The jury heard evidence that appellant changed his statement several times after his arrest. Moreover, as discussed under appellant's fifth assignment of error, 13 eye-witnesses ultimately identified appellant as either the initial assailant or a participant in the stomping. In light of the significant evidence of appellant's guilt, there is no basis for the contention that the jury premised its murder and felonious assault verdicts upon the arguably irrelevant fact that appellant was, at one point, charged with obstructing official business. We therefore hold the erroneous admission of the statement is therefore harmless as a matter of law.

**{¶95}** Appellant's third assignment of error lacks merit.

**{¶96}** Appellant's fourth assignment of error provides:

**{¶97}** "The appellant was denied his right to the effective assistance of trial counsel due to counsel's failure to object to victim-impact evidence."

**{¶98}** To establish ineffective assistance of counsel, an appellant must show that his attorney's performance was deficient and that the alleged deficiencies prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984). Both the performance and prejudice prongs must be established to demonstrate counsel's ineffectiveness.

**{¶99}** An attorney's performance is deficient if, after considering the totality of the circumstances, his or her representation fell below an objective standard of reasonableness. *Id*. at 688. A court, however, "must indulge in a strong presumption

29

that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Debatable trial tactics do not generally constitute deficient performance. *State v. Phillips*, 74 Ohio St.3d 72, 85 (1995), citing *State v. Clayton*, 62 Ohio St.2d 45, 49 (1980).

{¶100} With respect to the prejudice prong, an appellant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland, supra*, at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Id.*

{¶101} Appellant contends his counsel was ineffective for failing to object to what he characterizes as victim impact statements made during the guilt phase of the trial. Appellant points to testimony of Pataky and Chelko, who visited the victim in the hospital daily prior to his removal from life support, as well as the testimony of the victim's father, John Kernich, who elaborated on his son's character and what it was like to see him in the hospital and make funeral arrangements. Appellant asserts the statements were unrelated to the issue of appellant's legal culpability and only served to enflame the emotions of the jury. We do not agree that counsel's failure to object to the testimony at issue rendered his assistance ineffective.

{¶102} Given the circumstances of the crime, counsel could have reasonably concluded objecting to the testimony of the victim's friends and father would have made appellant appear callous and remorseless to the profound loss suffered by these individuals. Or, alternatively, counsel could have reasonably concluded that objecting to the testimony could have drawn additional attention to the testimony thereby compounding the weight of that evidence. Either way, the decision not to object falls

within the gamut of reasonable trial strategy. *See State v. Brown*, 8th Dist. Cuyahoga No. 84059, 2004-Ohio-6862, ¶38 ("[o]bjections to the testimony of the victim's wife may have soured the jury. It is possible that the jurors would have viewed counsel's objections as an affront to a sympathetic witness, and counsel could rationally conclude that an objection was not worth the risk of antagonizing the jury."); *see also State v. Boeddeker*, 12th Dist. Clermont No. CA2009-05-029, 2010-Ohio-106, ¶19 ("had trial counsel objected to Cupp's testimony, it may have negatively impacted the jury's opinion of Boeddeker. An objection to testimony from the victim's mother may have left the jury feeling resentful that Boeddeker was trying to shield the jury from hearing more about [the victim.]") Trial tactics, even those which might be considered debatable, may not form the basis of an ineffectiveness claim. *See e.g. Phillips*, *supra*. In this respect, we therefore hold counsel's performance did not fall below an objective standard of reasonable representation.

{¶103} Even if counsel's failure to object was viewed as error, however, appellant suffered no ostensible prejudice as a result of the omission. Appellant has failed to provide a basis for his conclusion that, absent the purported victim-impact testimony, there was a reasonable likelihood the outcome of the trial would have been different. Given the surfeit of witness testimony identifying appellant as either the initial assailant, a participant in the stomping, or both, there is no basis for the conclusion that the inclusion of the victim-impact testimony contaminated the proceedings or rendered them unfair.

{¶104} One final point must be addressed. The state argues trial counsel could not be held ineffective for failing to object to the purported victim impact testimony

because such testimony is permissible to establish the victim "had been a living person." The state cites to the Ohio Supreme Court's ruling in *State v. Noling*, 98 Ohio St. 3d 44, 2002-Ohio-7044 in support of its contention.

{¶105} In *Noling*, the Supreme Court concluded no error existed when the trial court admitted victim impact testimony from (1) the individual who discovered the bodies of two murder victims and (2) the niece of the victims. The former witness was the son of the victims' neighbor as well as their friend. He testified, over objection, that the victims enjoyed playing cards, talking to people, and working around their yard. The victims' niece provided testimony regarding summers she spent with the victims.

{¶106} The Supreme Court first noted that the trial court had sustained various objections relating to details of the lives of the victims. This apparently indicated the trial court was conscientious of the potential unfair prejudice the defendant could suffer if such evidence was admitted. The Court then determined the testimony challenged by Noling was not merely inflammatory, but actually served to establish essential features of the crimes charged. With respect to the individual who discovered the bodies, the court observed his testimony helped explain why he went to check on the victims; namely, they were gregarious and meticulous neighbors and, when he noticed their lawn mower was left out and their garage door opened, he became suspicious. The court also noted the testimony helped establish a time of death.

{¶107} Further, the Court held the testimony of the niece simply established the victims were living human beings, "an element of the aggravated murder charge." *Id.* at ¶56. Regarding this testimony, the Court emphasized that victims can never be separated from a criminal act. *Id.* at ¶57.

{¶108} We recognize that *Noling* provides the state with some latitude to establish the seemingly tautological proposition that a victim was a living person. We do not read *Noling*, however, as giving the prosecution carte blanche to elicit emotionally evocative testimony regarding the victim's life and/or death without restraint or concern for misconduct. The Court in *Noling* underscored that the testimony it considered was "not *simply inflammatory.*" *Id.* at ¶57. Accordingly, although the state may produce some evidence "proving life," this evidence should not extend to gratuitous testimony that functions to simply inflame the passions of the jury.

{¶109} With the foregoing in mind, we hold the alleged victim impact evidence in this case was not so inflammatory as to undermine confidence in the outcome. Accordingly, counsel was not ineffective for failing to object to the alleged victim impact evidence presented in this case.

{¶110} Appellant's fourth assignment of error is without merit.

{¶111} For the reasons discussed in this opinion, the judgment of the Portage County Common Pleas is affirmed.


TIMOTHY P. CANNON, P.J.,

THOMAS R. WRIGHT, J.,

concur.