[Cite as *State v. Scott*, 2018-Ohio-198.]

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 27254 |
| | : | |
| v. | : | Trial Court Case No. 2015-CR-3057 |
| | : | |
| MICHAEL D. SCOTT | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . . .

## O P I N I O N

Rendered on the 19th day of January, 2018.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. JANS, Atty. Reg. No. 0084470, and MICHAEL J. SCARPELLI, Atty. Reg. No. 0093662, Assistant Prosecuting Attorneys, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
      Attorneys for Plaintiff-Appellee

BROCK A. SCHOENLEIN, Atty. Reg. No. 0084707, 371 West First Street, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

TUCKER, J.

{¶ 1} Defendant-appellant, Michael D. Scott, appeals from his convictions for two counts of murder, plus firearm specifications; two counts of felonious assault, plus firearm specifications; one count of having a weapon while under disability; and one count of possession of a firearm in liquor permit premises. Raising seven assignments of error, Scott argues that the trial court erred by: (1) overruling his motion to suppress two pretrial identifications; (2) mishandling the potential testimony of C.J. Spears; (3) overruling his motion for acquittal on the charges of murder; (4) refusing to instruct the jury on the lesser included offenses of involuntary manslaughter and reckless homicide; (5) admitting certain photographs showing him holding a handgun matching the description of the murder weapon; and (6) allowing a police officer to provide narrative testimony during the jury's viewing of a security video. Additionally, Scott argues that the jury's verdicts were against the manifest weight of the evidence. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} On Saturday, September 26, 2015, Joshua Hamilton attended his sister Bridget's birthday party at Kricket's Tavern in Huber Heights, along with his other sister, Brittany, and one of Brittany's friends. Trial Tr. vol. 3, 1099-1102. The staff that evening consisted of four persons, one of whom served as a host and took photographs to be used for promotional purposes. *Id.* at 1054-1055.

{¶ 3} At last call, between 2:00 a.m. and 2:30 a.m. on Sunday, September 27, 2015, customers began filing out of the tavern and into the parking lot. Trial Tr. vol. 2, 543-545; Trial Tr. vol. 3, 1064-1065. Shortly thereafter, Brittany's friend discovered that she had misplaced her cellular telephone, so she walked back inside with Brittany and

Joshua to search for it. Trial Tr. vol. 4, 1182-1184. Brittany asked several exiting customers whether they might have picked up the phone, and in response, one man used vulgar language and shoved her towards the bar. Trial Tr. vol. 3, 1113-1116. A group of customers then assaulted Joshua, who fell to the floor. Trial Tr. vol. 2, 546-547 and 647-649.

{¶ 4} Tavern employees Herbert Boyd and Tyrone Moss intervened, dispersing those involved in the fight. Trial Tr. vol. 2, 546-548; Trial Tr. vol. 3, 1007-1010. As the fight broke up, Boyd saw a man near the entrance, afterward identified as Appellant, "pull up a gun." Trial Tr. vol. 2, 548-549 and 555-556; Trial Tr. vol. 3, 869-873 and 947-952. Boyd dodged or pivoted out of the way, and moments later, he heard two to three gunshots. Trial Tr. vol. 2, 553-554 and 559-560. After the shots were fired, Joshua Hamilton lay dead, having been killed by a shot in the back. Trial Tr. vol. 2, 437, 442, 450-453 and 460-461. The tavern's surveillance system captured video of the shooting. *Id.* at 516 and 580-581. Within minutes, another man fired several more shots in the parking lot. Trial Tr. vol. 3, 789-792 and 951.

{¶ 5} A Montgomery County grand jury issued an indictment on October 9, 2015, charging the Appellant with two counts of murder, plus firearm specifications; two counts of felonious assault, plus firearm specifications; one count of having a weapon while under disability; and one count of possession of a firearm in liquor permit premises. On November 17, 2015, Appellant moved to suppress pretrial identifications made by two witnesses; the trial court overruled the motion in its decision of April 18, 2016.

{¶ 6} Following a jury trial, Appellant was convicted on all counts.[1] He timely

---

[1] Count Five of the indictment, having a weapon while under disability, was tried to the

appealed to this court by filing his notice of appeal on September 6, 2016.

## II. Analysis

{¶ 7} For his first assignment of error, Appellant contends that:

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS.

{¶ 8} Appellant objects to the trial court's ruling on his motion to suppress as it relates to the pretrial identifications made by Victor Jefferson and Christopher Nance, customers who visited Kricket's Tavern and witnessed the shooting. Trial Tr. vol. 3, 771-773, 786-787, 930-931 and 947-950. According to Appellant, the identifications made by Messrs. Jefferson and Nance should have been deemed unreliable because officers with the Huber Heights Police Division did not use a conventional "mug shot photo spread[]" during their interviews with the two men. *See* Appellant's Br. 1-3. Appellant also argues that the identifications should be deemed unreliable because Jefferson and Nance provided inaccurate—or, at least, contradictory—descriptions of the shooter in their testimony at the hearing on his motion to suppress. *See id.*

{¶ 9} Appellate "review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. As the trier of fact, a trial court "is in the best position to weigh * * * evidence * * * and evaluate [the credibility of] witness[es]," so an "appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982); *State v. Graves*, 12th Dist. Clermont No. CA2015-03-022, 2015-Ohio-3936, ¶ 9, citing *State v. Cruz*, 12th Dist. Preble No.

bench.

CA2013-10-008, 2014-Ohio-4280, ¶ 12. Accepting the trial court's findings of fact as true, "the appellate court must then independently determine, without deference to the [trial court's legal] conclusion[s]," whether the "facts satisfy the applicable * * * standard." *Burnside*, 2003-Ohio-5372, ¶ 8, citing *Fanning*, 1 Ohio St.3d 19, and *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539 (3d Dist.1997). For motions to suppress directed specifically at pretrial identifications, a trial court's ruling is reviewed under the abuse-of-discretion standard. *State v. McComb*, 2017-Ohio-4010, ___ N.E.3d ___, ¶ 33 (2d Dist.), citing *State v. Moody*, 2d Dist. Montgomery No. 26926, 2016-Ohio-8366, ¶ 14.

{¶ 10} Due process may require suppression of an eyewitness's pretrial identification of a person when the basis of the identification creates a very substantial likelihood that the eyewitness is mistaken. *See Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 208, citing *Foster v. California*, 394 U.S. 440, 442, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). To prevail on a motion to suppress a pretrial identification, a "defendant must * * * show that the identification procedure was unduly suggestive." *State v. Harris*, 2d Dist. Montgomery No. 19796, 2004-Ohio-3570, ¶ 19. If the defendant makes this showing, then the court must "consider whether the identification, [in] the totality of the circumstances, is reliable despite the suggestive[ness] [of the] procedure." *Id.*, citing *State v. Wills*, 120 Ohio App.3d 320, 324, 697 N.E.2d 1072 (8th Dist.1997). The "factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the [subject being identified] at the [relevant] time * * *, the witness'[s] degree of attention, the accuracy of the witness'[s] prior description of the [subject], the [witness's] level of certainty * * *, and the length of time" between the

witness's initial encounter with the subject and the subsequent identification. *See Neil*, 409 U.S. at 199-200.

**{¶ 11}** Detective Fosnight and Detective Colvin of the Huber Heights Police Division interviewed Victor Jefferson on October 22, 2015, and Christopher Nance on October 23, 2015. Am. Decision, Order & Entry Overruling in Part and Sustaining in Part Def.'s Mot. to Suppress 5-6, Feb. 16, 2016. The detectives asked Jefferson and Nance to identify the shooter and showed them three of the photographs taken on the night of the shooting by Mark Greene, the host and promotional photographer. *Id.* at 3 and 5-6. Both of them identified Appellant, noting his distinctive hairstyle and clothing. *Id.* at 5-6.

**{¶ 12}** This procedure did not comport with R.C. 2933.83 or usual police practices. *Id.* at 3 and 6. Generally, the Huber Heights Police Division requires that a photographic lineup be shown to witnesses by a blind administrator and consist of six mugshots—a recent photograph of the suspect under investigation, as well as photographs of five other persons with similar physical characteristics. *Id.* at 3. At the hearing on Appellant's motion to suppress, Detective Fosnight testified that between the night of the shooting and Appellant's arrest on October 2, 2015, he could not obtain a mugshot of Appellant suitable for a standard lineup;[2] he and Detective Colvin therefore used Greene's photographs to interview a number of witnesses before Appellant's arrest. *Id.* at 6. He further testified that after Appellant's arrest, he and Detective Colvin continued to use the

---

[2] Detective Fosnight obtained a driver's license photograph of Appellant, though the photo proved to be unsuitable because, in contrast to Appellant's appearance in late September, 2015, he looked younger, wore his hair shorter, and had no visible tattoos. Am. Decision, Order & Entry Overruling in Part and Sustaining in Part Def.'s Mot. to Suppress 3.

same three photographs to "maintain[] * * * consistency" among interviews, although he could have obtained a mugshot of Appellant at that point.   Tr. of Hr'g on Mot. to Suppress 83-84.

{¶ 13} The trial court found this procedure "unduly suggestive" but ultimately determined that neither Jefferson nor Nance was likely to have misidentified Appellant as the shooter.   Am. Decision, Order & Entry Overruling in Part and Sustaining in Part Def.'s Mot. to Suppress 11; Decision, Order & Entry Overruling Def.'s Mot. to Suppress 6-8, Apr. 18, 2016.   We concur with the trial court's determination.[3]

### A. Identification of Appellant by Victor Jefferson

{¶ 14} In the minutes preceding the shooting, Victor Jefferson took note of Appellant's hairstyle, clothing and boisterous behavior, and when interviewed at the scene, he provided a description of Appellant that proved consistent with Appellant's actual appearance.   Tr. of Hr'g on Mot. to Suppress 126-130; Trial Tr. vol. 3, 776-778 and 797-804.   He identified Appellant in Greene's photographs roughly three weeks later with "one hundred percent" confidence, voicing the same degree of confidence during his testimony at Appellant's trial.   Tr. of Hr'g on Mot. to Suppress 143-145; Trial Tr. vol. 3, 805-807.

---

[3] To the extent the trial court found that the lineup procedure used by Detectives Fosnight and Colvin was unduly suggestive only because "there was no reason to deviate from the guidelines set forth in R.C. 2933.83," we disagree.   Non-compliance with the statute is not equivalent to undue suggestiveness.   *Compare* Am. Decision, Order & Entry Overruling in Part and Sustaining in Part Def.'s Mot. to Suppress 11, *with State v. Williams*, 2d Dist. Montgomery No. 26357, 2015-Ohio-1403, ¶ 12-17, *and State v. Moon*, 2d Dist. Montgomery No. 25061, 2013-Ohio-395, ¶ 21-32.   Instead, a "lineup is unduly suggestive if it steers [a] witness to [a specific] suspect[] independent of the witness's honest recollection."   *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 208.

**{¶ 15}** Appellant argues that Jefferson's identification should not be deemed reliable and refers to "three concerning problems that were pointed out at the trial level" in support of his argument: (1) Jefferson "testified that he was outside the bar when" Joshua Hamilton was initially assaulted; (2) Jefferson "was 'fifty feet away from the fight' (and on the other side of a wall)" at the time; and (3) Jefferson "was positive that the shooter was not wearing a shirt at the time of the fight/shooting [sic]," though other witnesses were equally "positive that the shooter was * * * wearing a white '[A]ffliction' T-shirt" at that moment.[4]  (Emphasis omitted.)   Appellant's Br. 5.   This characterization of Jefferson's testimony is misleading.

**{¶ 16}** At the hearing on Appellant's motion to suppress, Jefferson did testify on direct examination that he was "on the sidewalk * * * [out]side" and "probably, * * *, 50 feet away" when Joshua was assaulted, but on cross-examination, he testified that he was inside when the altercation started, that he exited in response, and that he was only "10 feet" away, rather than 50.   Tr. of Hr'g on Mot. to Suppress 126-127, 132, 151 and 154-159.   He also testified that as other customers "rushed out" of Kricket's Tavern in the midst of the altercation, he "look[ed] <u>inside of the door</u>" and "remember[ed] seeing a guy [ly]ing down on the ground, [whom] people [were] helping * * * up."   (Emphasis added.)   *Id.* at 126-127 and 132.   Hence, regardless of the fact that Jefferson was outside of the building when Joshua was shot, his testimony establishes that he had a direct view of Joshua and the shooter at the relevant time.

**{¶ 17}** Moreover, Jefferson did not testify that the shooter was not wearing a shirt

---

4  *See* Wikipedia, *Affliction Clothing*, https ://en. wikipedia. org/wiki/ Affliction _Clothing (as of October 27, 2017, 05:31 GMT).

when shots were fired inside Kricket's Tavern. *Id.* at 160-161 and 175-179. Instead, Jefferson testified that the shooter was not wearing a shirt <u>during the fistfight</u>, and that "after the fight," the shooter "r[an] outside [and] c[ame] back [wearing a] long-sleeve" sweater or jacket.[5] *Id.* at 135-136 and 160-162. For that matter, Jefferson never wavered in his belief that Appellant fired the shots. *Id.* at 127-128, 130, 150-152, 160-162 and 178-180; *see also* Trial Tr. vol. 3, 837-838. At the hearing on Appellant's motion to suppress, Jefferson testified as follows:

THE STATE: * * *. And what was going on as you were at the doorway [in Kricket's Tavern]?

JEFFERSON: Um, I noticed one guy that had his shirt taken off [and] was in the process of getting kicked out because he was bouncing off the walls while inside the bar, and they [were] trying to calm him down. He kept coming in; they kept kicking him out * * *. And, the last time he was kicked out, it was a fight that was started.

* * *

THE STATE: Okay. Can you describe what he looked like?

JEFFERSON: A black male, close to six-foot [tall], dreadlocks.

THE STATE: Okay. Do you remember what he was wearing---

* * *

---

[5] As discussed *infra*, between the night of the shooting and Appellant's trial, Jefferson confused the man who shot Joshua Hamilton with the man who fired shots in the parking lot. Jefferson described the latter man as wearing a long-sleeve sweater or jacket, and his account of the shooter "com[ing] back" after the fight wearing a long-sleeve sweater or jacket appears to be associated with this confusion. *Compare* Tr. of Hr'g on Mot. to Suppress 135-136, *with id.* at 178-180, *and* Trial Tr. vol. 3, 788-790 and 830-835.

JEFFERSON: Well, when I first [saw] him, he was wearing a white "Affliction" shirt.

THE STATE: * * *. [C]an you describe the shirt for us?

JEFFERSON: Black and white with a lot of lettering on it, with designs.

THE STATE: And you indicated he had dread[locks]?

JEFFERSON: Yes, sir.

Tr. of Hr'g on Mot. to Suppress 127-128. Next, Jefferson described what he saw in the parking lot, minutes after Joshua Hamilton had been shot:

THE STATE: * * *. And you say you heard about two to three [shots]?

JEFFERSON: Mm-hmm.

* * *

THE STATE: Okay. What happened next?

JEFFERSON: Um, after I heard the shots, I proceeded to look for my fiancée * * *. She was hiding [in the parking lot] on the side of a truck. [Then] I heard more shots. I looked down. I [saw] someone shooting a gun. * * *.

THE STATE: And so how far away [were] you from the shooter at [that] point?

JEFFERSON: Inches away.

* * *

THE STATE: Was this [person the] only [person] you saw with a gun

that night?

JEFFERSON: Yes, sir.

* * *

THE STATE: And how did you recognize him[] * * *?

JEFFERSON: Uh, I recognize[d] him [as] the guy that they kept kicking out—in and out of the bar.

THE STATE: Okay.  Is this the same gentleman you just earlier described for the [c]ourt with the dread[locks]?

JEFFERSON: Yes.

THE STATE: And with the "Affliction" T-shirt?

JEFFERSON: He didn't [have] a[n] "Affliction" T-shirt on then.

THE STATE: What [did] he have on * * *?

JEFFERSON: Uh, something long-sleeve.

* * *

THE STATE: But are you * * * certain it [was] the same [person] who was having * * * difficulties inside the bar?

JEFFERSON: Yes.

Id. at 133-136.   At Appellant's trial, however, Jefferson offered the following testimony:

THE STATE: Okay.  Did you see the actual shooting [i.e. the shooting of Joshua Hamilton]?

JEFFERSON: I did not see the actual shooting, but I could see, in the doorway, somebody was shooting.

* * *

THE STATE: How could you tell who it was?   By what means could you tell who it was?

JEFFERSON: Uh, 'cause it was the same guy that was in and out—that was getting kicked out [of] the bar.

* * *

THE STATE: And do you recall what he was wearing?

* * *

JEFFERSON: "Affliction" shirt, something like that.

* * *

THE STATE: [playing the surveillance video of the moment when Joshua Hamilton was shot]   And what does [the shooter] appear to be doing?

JEFFERSON: As clear as day, his arm is stretched out[,] and he's shooting.

* * *

THE STATE: Okay.   Did you see where he went [after that]?

JEFFERSON: Towards the parking lot.

* * *

THE STATE: Okay.   Now, at some point, there were other gunshots, correct?

JEFFERSON: Yes.

THE STATE: Tell us about that.

JEFFERSON: Um, minutes later, I walked to [sic] make sure my wife

was okay. And she was hiding on the side of a truck. And there was a guy that was in front of me that was shooting towards the crowd of cars. And I asked him 'cause, I mean, he was right there in front of me, "What are you shooting for?" He said he was in fear of his life and just wanted to---

DEFENSE COUNSEL: Objection, Your Honor.

JEFFERSON: ---get out of there.

THE COURT: Sustained. [The jury will] disregard any statement made to [the witness] by the other individual.

THE STATE: Okay. Well, let me stop you and back you up. You saw another individual---

JEFFERSON: Well, I---

THE STATE: ---shooting?

JEFFERSON: ---I thought it was the suspect [in the shooting of Joshua Hamilton], but [now that] I [have] reviewed the video and seen him leaving, it was somebody else.

Trial Tr. vol. 3, 787-790.

{¶ 18} As his testimony illustrates, Jefferson confused Appellant with the man who fired shots in the parking lot. Yet, having been shown the surveillance video, Jefferson recanted his earlier testimony and testified that Appellant and the shooter in the parking lot were two different men. *Id.* at 790-791 and 831-832. Evaluating the entirety of Jefferson's testimony, we concur with the trial court's conclusion that Jefferson was unlikely to have misidentified Appellant.[6]

---

[6] When it entered its final decision on Appellant's motion to suppress, the trial court

{¶ 19} Although Jefferson initially expressed confidence that Appellant was responsible for firing the shots inside Kricket's Tavern and the shots outside in the parking lot, he consistently described Appellant as wearing a white "Affliction" T-shirt, whereas he described the man who fired shots in the parking lot as wearing "something long-sleeve," possibly "a sweater[] [or] maybe a jacket."[7]   Tr. of Hr'g on Mot. to Suppress 135-136; Trial Tr. vol. 3, 833-837.   Further, at Appellant's trial, Jefferson testified that on the night of the shooting, he believed that two different men were responsible for the shots inside and the shots outside, but afterward came to think that only one man was responsible because Appellant and the man in the parking lot "sort of resembled [each other] or looked alike."   *See* Trial Tr. vol. 3, 835.   Thus, despite the fact that Jefferson's interpretation of his observations changed between the night of the shooting and Appellant's trial, the objective content of his observations remained unchanged.   *Compare* Tr. of Hr'g on Mot. to Suppress 127-128, *with* Trial Tr. vol. 3, 777-778 and 787-788.   That is, Jefferson testified to seeing a man—who was nearly six feet tall, had been wearing an "Affliction" T-shirt earlier in the evening, and had dreadlocks—standing in the entrance to Kricket's Tavern with "his arm * * * stretched out" at the moment Joshua Hamilton was shot.   Trial Tr. vol. 3, 787-788; Tr. of Hr'g on Mot. to Suppress 167.   The inconsistencies between Jefferson's testimony at the hearing on Appellant's motion to suppress and his testimony at Appellant's trial, though not insignificant, were thus appropriately left to the jury to evaluate as part of its consideration of Jefferson's credibility.

---

implicitly assumed that the same man fired the shots inside and outside of Kricket's Tavern.  *See* Decision, Order & Entry Overruling Def.'s Mot. to Suppress and 6.  We concur with the court's conclusion even so, though our analysis differs in some respects.

[7] *See supra* note 4.

{¶ 20} Jefferson's testimony establishes that he had a direct line of sight to Appellant at the relevant time; that his attention was drawn to Appellant because of Appellant's raucous behavior; that he had a high level of certainty that Appellant shot Joshua; and that roughly three weeks passed between the night of the shooting and the October 22, 2015 interview in which Jefferson identified Appellant in the photographs exhibited by Officers Fosnight and Colvin. Am. Decision, Order & Entry Overruling in Part and Sustaining in Part Def.'s Mot. to Suppress 5-6; Tr. of Hr'g on Mot. to Suppress 126-127, 132, 143, 151 and 154-159; Trial Tr. vol. 3, 776-778 and 805-806. Accordingly, we conclude that Jefferson was unlikely to have misidentified Appellant. *See Neil v. Biggers*, 409 U.S. 188, 199-200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

**B. Identification of Appellant by Christopher Nance**

{¶ 21} Appellant challenges the identification made by Christopher Nance on the basis of two aspects of Nance's testimony. *See* Appellant's Br. 5. First, Nance testified that the man who shot Joshua Hamilton "was wearing a white shirt and dark jeans," but a "photograph admitted into evidence [at the hearing on Appellant's motion to suppress] clearly established that [Appellant] was wearing a white shirt and white pants that evening." (Emphasis omitted.) *Id.* Second, though Victor Jefferson testified that he saw Appellant with "his shirt taken off" at various points, Nance testified that he had no "recollection" of seeing Appellant without a shirt. *Id.*; Tr. of Hr'g on Mot. to Suppress 127-128, 202 and 225-230; Trial Tr. vol. 3, 777.

{¶ 22} In its decision on Appellant's motion to suppress, the trial court noted that "Nance observed [Appellant] standing over [Joshua] immediately after the gunshots were fired"; that Nance was "approximately [15] to [20] feet away from [Appellant] when the

shooting occurred"; and that "Nance consistently reported that the shooter had neck and facial tattoos, as well as dreadlocks." Decision, Order & Entry Overruling Def.'s Mot. to Suppress 7. Regarding the question of the color of Appellant's pants, the court found that "although [Nance] thought [Appellant] was wearing dark jeans, he mostly noticed [Appellant]'s hair and tattoos," making Appellant's "clothing * * * a very minor part" of his identification. *Id.* at 8. The court concluded that "a mistake with respect to that [single] detail d[id] not make [Nance's] identification unreliable" and found that "there was not a substantial likelihood of misidentification by Mr. Nance, based upon the totality of the circumstances." *Id.*

{¶ 23} We concur with the trial court. Application of the test set forth in the U.S. Supreme Court's *Neil* decision warrants the finding that Nance was unlikely to have misidentified Appellant. *See Neil v. Biggers*, 409 U.S. 188, 199-200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); Decision, Order & Entry Overruling Def.'s Mot. to Suppress 7. Furthermore, Nance testified merely that he had no "recollection" of seeing Appellant without a shirt, which hardly amounts to an irreconcilable conflict with Jefferson's testimony, particularly given the ambiguous nature of Jefferson's testimony on this issue. *Compare* Tr. of Hr'g on Mot. to Suppress 202 and 229-230, *with id.* at 135-136 and 159-162.

{¶ 24} We hold that the trial court did not abuse its discretion in determining that neither Victor Jefferson nor Christopher Nance was likely to have misidentified Appellant. *State v. McComb*, 2017-Ohio-4010, ___ N.E.3d ___, ¶ 33 (2d Dist.). Appellant's first assignment of error is overruled.

{¶ 25} For his second assignment of error, Appellant contends that:

THE TRIAL COURT ERRED IN THE MANNER IN WHICH IT HANDLED THE POTENTIAL TESTIMONY OF C.J. SPEARS.

{¶ 26} In his brief, Appellant argues that his convictions should be vacated as the result of prosecutorial misconduct. He blames the prosecutor for improperly "comment[ing] on the veracity of [C.J.] Spears's upcoming testimony[]" during opening statements to the jury, and for referring to the "anticipated[] substance of [her] testimony" even though the State "knew that Spears would be either recanting[] [her prior statements] or taking the Fifth Amendment." Appellant's Br. 7.

{¶ 27} Prosecutors, in general, "are entitled to considerable latitude in opening and closing arguments." *State v. Whitfield*, 2d Dist. Montgomery No. 22432, 2009-Ohio-293, ¶ 12, citing *Maggio v. Cleveland*, 151 Ohio St. 136, 84 N.E.2d 912 (1949), and *State v. Ballew*, 76 Ohio St.3d 244, 667 N.E.2d 369 (1996). To resolve a claim of prosecutorial misconduct, courts evaluate "whether [such] remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." *State v. Jones*, 90 Ohio St.3d 403, 420, 739 N.E.2d 300 (2000), citing *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). The "touchstone of [this] analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *Id.*, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Accordingly, "[w]here it is clear beyond a reasonable doubt that a jury would have found the defendant guilty even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed." *State v. Stevenson*, 2d Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42, citing *State v. Loza*, 71 Ohio St.3d 61, 78, 641 N.E.2d 1082 (1994). We "review allegations of prosecutorial misconduct in the context of the entire trial." *State v. Renner*, 2d Dist. Montgomery No.

25514, 2013-Ohio-5463, ¶ 47, citing *Stevenson*, 2008-Ohio-2900, ¶ 42.

{¶ 28} Officers with the Huber Heights Police Division spoke with C.J. Spears on at least two occasions after the shooting of Joshua Hamilton and before Appellant's trial. Mot. for Court to Take Witness as Its Own 3-4, July 19, 2016. Spears initially indicated that she had material knowledge of the shooting and the events leading up to the shooting, but during her second conversation with officers, she claimed that she fabricated the entirety of what she had said previously. *Id.* At the State's request, Spears was designated the court's witness, and she was granted transactional immunity. Appellant's Br. 11; Appellee's Br. 11.

{¶ 29} The prosecutor offered the following comments regarding Spears during opening statements:

[One of the State's witnesses will be] C.J. Spears. C.J. Spears went to [Kricket's Tavern] that night with [Appellant]. She drove [Appellant] to the bar. And she told the police that [Appellant] had a gun when he went into the bar—well, before he went to the bar. And she told the police that [Appellant] had to have taken [the gun] into the bar because her car was locked. She was the only one with the keys. Now, C.J. Spears is here, and she is not here because she wants to be. She is going to be a very reluctant witness.

Trial Tr. vol. 2, 428-429. Appellant's trial counsel objected to these comments, and the court overruled the objection. *Id.* at 429. When Spears later took the stand, she stated her name and acknowledged that she knew Appellant. *Id.* at 687-688. She invoked her Fifth Amendment privilege in answer to all other questions, and the court instructed the

jury that "Spears'[s] assertion of her Fifth Amendment privilege to remain silent [could] not be considered * * * in any way relating to the charges against [Appellant]." *Id.* at 687-690 and 698-699.

**{¶ 30}** In Appellant's view, the prosecutor's remark that Spears would be "a very reluctant witness" was the equivalent of "directly commenting on the veracity of [her] upcoming testimony." Appellant's Br. 8. He argues that the prosecutor's remark was as problematic as a comment we held in *Renner* to be "improper for opening statements," but in that case, the prosecutor implied that the witness, a victim of domestic abuse, might not testify truthfully because the witness " 'want[ed] nothing more than to protect her husband.' " *See State v. Renner*, 2d Dist. Montgomery No. 25514, 2013-Ohio-5463, ¶ 10-17 and 56-58. Here, by contrast, the prosecutor did not imply that Spears had a motive to falsify her testimony but merely observed that Spears did not want to testify. We find that depicting Spears as a reluctant witness, particularly in the absence of any speculation about the cause of her reluctance, is distinctly different from commenting on her honesty. Her reluctance to testify against a murder suspect could have been the result of an aversion to recalling a traumatic event or a fear of retaliation by the suspect or the suspect's friends.[8]

**{¶ 31}** Regarding the prosecutor's references to what Spears had previously told the Huber Heights Police Division, we construe these remarks as a description of Spears's anticipated testimony, which would not be improper. *See, e.g., State v. Gilbert*, 10th Dist. Franklin No. 04AP-933, 2005-Ohio-5536, ¶ 16 (pointing out that the

---

[8] Appellant's defense counsel, in fact, alleged in his own opening statement that Spears "was intimidated and threatened by the police into saying what they want[ed] to hear." Trial Tr. vol. 2, 436.

"prosecution can summarize evidence, * * * describe evidence, [and] anticipate evidence" in opening statements). Nevertheless, assuming for sake of analysis that the remarks were improper, we find no reason to conclude that they unfairly prejudiced Appellant.

{¶ 32} Ashley Byrd, Joshua Hamilton's cousin, saw Appellant walking toward the entrance to Kricket's Tavern holding a gun in the moments before the shooting. Trial Tr. vol. 3, 865-869 and 877-880. Herbert Boyd, who worked as the disc jockey on the night of the shooting, testified that after Joshua fell to the ground during the fistfight, he saw Appellant holding a gun near Joshua and heard two to three shots moments later. *See* Trial Tr. vol. 2, 547-549, 553 and 558-560. Victor Jefferson testified to seeing Appellant standing in the entrance to the tavern with his arm extended immediately before the shots were fired, and Christopher Nance testified to seeing Appellant standing over Joshua looking down at him at the same time. Trial Tr. vol. 3, 776-778, 785-788, 945-954; Tr. of Hr'g on Mot. to Suppress 195-205.

{¶ 33} Given the testimony of these witnesses, especially that of Ashley Byrd and Herbert Boyd, the prosecutor's description of Spears's anticipated testimony did not result in unfair prejudice. Although the prosecutor indicated Spears would testify that Appellant brought a gun to Kricket's Tavern, the testimony offered by Byrd and Boyd independently established that Appellant had a gun in his hand immediately before Joshua Hamilton was shot.[9] The trial court, moreover, promptly delivered an appropriate limiting

---

[9] For the same reason, we find likewise that the questions asked of Spears did not result in unfair prejudice. The questions, as Appellant acknowledges, did no more than echo the prosecutor's remarks during opening statements. *See* Trial Tr. vol. 2, 428-429 and 687-690. Irrespective of what the jury might have deduced about the testimony Spears would have offered, the key fact—Appellant's possession of a gun at Kricket's Tavern— entered the record through the testimony of two other witnesses, Herbert Boyd and Ashley Byrd.

instruction to the jury.   Trial Tr. vol. 2, 698-699.

{¶ 34} In addition, Appellant accuses the State of knowing either "that Spears would * * * recant[] [one or more of her statements to police], or tak[e] the Fifth Amendment at trial."   Appellant's Br. 7.   We view this accusation as implausible.   The State issued a subpoena to compel Spears's appearance, sought to have her declared the court's witness, apparently requested that she be granted transactional immunity, and objected when the court ruled that Spears could invoke the Fifth Amendment.[10]   If the State knew that Spears would assert her Fifth Amendment privilege at Appellant's trial, then it presumably could have saved itself considerable effort.   In any event, the record includes no evidence substantiating Appellant's accusation.   Appellant's second assignment of error is overruled.

{¶ 35} For his third assignment of error, Appellant contends that:

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S RULE 29 MOTION AS TO THE MURDER COUNT (PROXIMATE CAUSE).

{¶ 36} Appellant concedes that the State "certainly proved beyond any doubt that: (1) [he] possessed a weapon while under disability, (2) [he] possessed said weapon in a liquor establishment, and (3) [he] was in possession of the firearm that, * * *, in whatever manner it was fired, caused Joshua Hamilton's death."   Appellant's Br. 15.

---

[10] The record does not include a copy of "a written request" made by the State to this effect.   *See* R.C. 2945.44(A)(1).   Regardless, the parties themselves acknowledged that Spears had at least prospectively been granted immunity.   Trial Tr. vol. 2, 488-489 and 694-695.   With respect to its ruling that Spears could invoke the Fifth Amendment despite being granted immunity, the trial court does not seem to have erred; immunity notwithstanding, Spears could theoretically have suffered collateral consequences depending upon the content of her testimony.   *See* R.C. 2945.44(C); *see also State v. Adams*, 153 Ohio App.3d 134, 2003-Ohio-3086, 791 N.E.2d 1045, ¶ 22-39 (7th Dist.).

Nevertheless, Appellant argues "there is no evidence in the record * * * that [he] intentionally fired the weapon, or that he did so knowingly, as opposed to accidentally or recklessly." *Id.* In other words, Appellant argues the State failed to prove that his conduct proximately caused the death of Joshua Hamilton. *Id.* at 15-16.

{¶ 37} An appellate court reviews a trial court's ruling on a motion under Crim.R. 29 by "the same standard * * * used to review a claim based on the sufficiency of the evidence." *State v. Bailey*, 2d Dist. Montgomery No. 27177, 2017-Ohio-2679, ¶ 17, citing *State v. Page*, 2d Dist. Montgomery No. 26670, 2017-Ohio-568, ¶ 7. The "relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of [a given offense] proven beyond a reasonable doubt." *Id.*, citing *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997).

{¶ 38} Here, the indictment charged Appellant with two counts of murder under R.C. 2903.02(B) and 2903.11(A), both of which stemmed from Joshua Hamilton's death. These charges required that the State prove:

1. Under R.C. 2903.02(B) and 2903.11(A)(1), that Appellant knowingly caused (or attempted to cause) serious physical harm to Joshua Hamilton; or under R.C. 2903.02(B) and 2903.11(A)(2), that Appellant knowingly caused (or attempted to cause) physical harm to Joshua Hamilton by means of a deadly weapon;[11]

---

[11] R.C. 2901.22(B) states that a "person acts knowingly, regardless of purpose, when [he] is aware that [his] conduct will probably cause a certain result or will probably be of a certain nature," and that a person "has knowledge of circumstances when [he] is aware that such circumstances probably exist." Further, when "knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person

2.  That Joshua Hamilton suffered physical harm; or that he suffered serious physical harm from Appellant's use of a deadly weapon; and

3.  That the harm suffered by Joshua Hamilton was the proximate result of Appellant's commission of felonious assault under R.C. 2903.11(A)(1) or 2903.11(A)(2).

R.C. 2903.02(B) and 2903.11(A); *see, e.g., State v. Jones*, 2d Dist. Clark No. 2005 CA 122, 2007-Ohio-2425, ¶ 11-12.

{¶ 39} At its root, Appellant's challenge to the trial court's ruling on his Crim.R. 29 motion is that the State presented only circumstantial evidence of his state of mind.  *See* Appellant's Br. 17-18.  Proof "of an accused's purpose or specific intent," however, "invariably requires circumstantial evidence, absent an admission."  *State v. Mundy*, 99 Ohio App.3d 275, 288, 650 N.E.2d 502 (2d Dist.1994).  Appellant suggests that his conduct should have been deemed reckless, at worst, because:

The chaotic fight, combined with the facts that: (1) no one saw [him] point the gun and fire, (2) the shooting seemed "reckless" to * * * Herbert Boyd[], (3) a stray bullet was found in [a] wall [in] Kricket's Tavern, (4) witnesses could not agree on how many shots were fired * * *, (5) the bullet [travelled in] an upward trajectory in [Joshua] Hamilton's back, * * * yet, he [is] taller than Hamilton [was], (6) a complete lack of animosity between the parties prior to the fight, and (7) that the [six] shell casings found in the parking lot, * * *, were definitely from a different gun than [that which

---

subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact."

produced] the single bullet casing found in the bar, all paint a picture of a reckless shooting death, but not an intentional or knowing one[.]

Appellant's Br. 18. Even assuming that these "facts" are objectively accurate characterizations of the evidence adduced at Appellant's trial, they provide no greater insight into Appellant's state of mind than the evidence on which the State relied. For example, whether or not witnesses saw Appellant aim a gun at Joshua Hamilton and squeeze the trigger, witnesses did see Appellant, gun in hand, standing in close proximity to Joshua, and moments later, they heard at least one gunshot. Furthermore, the variation in the number of shots reported by the witnesses would seem to have little connection to Appellant's state of mind, and given that Joshua was lying on the ground when he was shot, the difference between his height and Appellant's height appears to be immaterial with respect to the path of the bullet through his body. For that matter, the shell casings found in the parking lot, having come from a second gun fired by a man other than Appellant, are simply irrelevant to the question of whether Appellant knowingly fired his own gun.

{¶ 40} A rational person could have concluded from the evidence that Appellant knowingly caused harm to Joshua Hamilton by means of a deadly weapon. Viewed in a light most favorable to the State, the evidence, coupled with permissible—and arguably unavoidable—inferences, justified the trial court's ruling on Appellant's motion under Crim.R. 29. Appellant's third assignment of error is overruled.

{¶ 41} For his fourth assignment of error, Appellant contends that:

APPELLANT'S CONVICTION ON THE MURDER COUNT WAS ENTERED AGAINST THE WEIGHT OF THE EVIDENCE.

{¶ 42} Appellant "reiterate[s] * * * the same arguments on the evidence" that he made in connection with his third assignment of error, asking that those arguments also be evaluated by the standard applicable to a challenge based upon the manifest weight of the evidence. Appellant's Br. 19. According to this standard, an "appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Cochran*, 2d Dist. Montgomery No. 27023, 2017-Ohio-216, ¶ 5, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Although an appellate court "must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses," the court nevertheless "may determine which of several competing inferences suggested by the evidence should be preferred." (Citation omitted.) *Id.* A conviction "should be reversed as being against the manifest weight of the evidence only in exceptional circumstances." (Citation omitted.) *Id.*

{¶ 43} As we noted in our discussion of Appellant's second assignment of error, two witnesses—Herbert Boyd and Ashley Byrd—saw Appellant in possession of a gun in the minutes leading to the shooting. Trial Tr. vol. 2, 547-549, 553 and 558-560; Trial Tr. vol. 3, 865-869 and 877-880. Boyd and Christopher Nance testified that they observed Appellant standing close to Joshua Hamilton immediately before shots were fired, and Victor Jefferson testified similarly that he saw Appellant standing in the entrance to Kricket's Tavern with his arm extended. Trial Tr. vol. 2, 547-549, 553 and 558-560; Trial Tr. vol. 3, 776-778, 785-788, 945-954; Tr. of Hr'g on Mot. to Suppress 195-205. Thus,

the testimony of no fewer than four witnesses placed Appellant, at the critical moment, in a spot from which he could have fired the shot that killed Joshua, and two of those witnesses saw a gun in Appellant's hand at that time. In light of these facts, we cannot conclude that the jury clearly lost its way. Appellant's fourth assignment of error is overruled.

{¶ 44} For his fifth assignment of error, Appellant contends that:

THE TRIAL COURT ERRED IN REFUSING TO PROVIDE THE JURY WITH A LESSER INCLUDED INSTRUCTION.

{¶ 45} Relying again on the arguments he raised in his third assignment of error, Appellant maintains that the trial court should have instructed the jury on involuntary manslaughter and reckless homicide as lesser included offenses with respect to murder. *See* Appellant's Br. 20-21. Appellant's defense counsel submitted corresponding proposed instructions in advance of Appellant's trial.

{¶ 46} Requested jury instructions "should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 240, citing *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591, 575 N.E.2d 828 (1991), and *State v. Griffin*, 141 Ohio St.3d 392, 2014-Ohio-4767, 24 N.E.3d 1147, ¶ 5. An "appellate court reviews a trial court's refusal to give a requested jury instruction for abuse of discretion." *Id.*, citing *State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989).

{¶ 47} The "question of whether a particular offense should be submitted to the finder of fact as a lesser included offense involves a two-tiered analysis." *State v.*

*Deanda*, 136 Ohio St.3d 18, 2013-Ohio-1722, 989 N.E.2d 986, ¶ 6, citing *State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, 911 N.E.2d 889, ¶ 13. In the first part of this analysis, a court "determine[s] whether [an] offense is generally a lesser included offense" relative to a given criminal charge. *Id.*, citing *State v. Kidder*, 32 Ohio St.3d 279, 281, 513 N.E.2d 31 (1987). In the second part, the court determines whether the "jury could reasonably find the defendant not guilty of the charged offense, but could convict the defendant of the lesser included offense." *City of Shaker Heights v. Mosely*, 113 Ohio St.3d 329, 2007-Ohio-2072, 865 N.E.2d 859, ¶ 11; *State v. Miller*, 2d Dist. Montgomery No. 25504, 2013-Ohio-5621, ¶ 23. If the jury could convict the defendant of the lesser included offense, then an instruction on that offense is required. *Miller*, 2013-Ohio-5621, ¶ 24, citing *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 192.

**{¶ 48}** In his request for an instruction on involuntary manslaughter, Appellant argued that the anticipated evidence, viewed in his favor, would allow "the jury [to] reasonably conclude that [he] was not guilty of the underlying charged offense of felonious assault, but rather a felony charge of aggravated assault or a misdemeanor charge." Def.'s Req. for Jury Instructions on Lesser Included Offenses of Involuntary Manslaughter and Reckless Homicide 2, July 14, 2016. Involuntary manslaughter "is a lesser included offense of aggravated murder with prior calculation and design[] [under] R.C. 2903.01(A), aggravated felony murder[] [under] R.C. 2903.01(B), and murder[] [under] R.C. 2903.02," although aggravated assault is an inferior degree offense with respect to felonious assault. *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 78-79; *see also State v. Conley*, 2015-Ohio-2553, 43 N.E.3d 775, ¶ 32

(2d Dist.). Because the elements of aggravated assault "are identical to the elements defining felonious assault, except for the additional mitigating element of serious provocation," an instruction "on aggravated assault must be given to the jury" if a "defendant presents sufficient evidence of [the] provocation." *Conley*, 2015-Ohio-2553, ¶ 32, citing *State v. Morrow*, 2d Dist. Clark No. 2002-CA-37, 2002-Ohio-6527, ¶ 7, fn. 2.

{¶ 49} After the close of evidence and before the parties delivered their closing statements to the jury, the State objected to Appellant's proposed jury instruction on involuntary manslaughter. Trial Tr. vol. 5, 1506. The trial court sustained the State's objection, finding that no evidence had been introduced showing that "Joshua Hamilton [had] any physical contact or [engaged in] any type of provocative contact with [Appellant]." *Id.* at 1508-1509.

{¶ 50} The testimony of Herbert Boyd, Tyrone Moss and Brittany Hamilton establishes that Joshua Hamilton did not initiate the fistfight and that Appellant became involved in the fight once it had already started. *See* Trial Tr. vol. 2, 545-557 and 640-658; Trial Tr. vol. 3, 1000-1010 and 1115-1120; *see also* Trial Tr. vol. 5, 1508-1509. In the absence of any provocational conduct on Joshua's part, vis-à-vis Appellant, the jury could not reasonably have found Appellant guilty of aggravated assault or, by extension, involuntary manslaughter. Hence, we agree that an instruction on involuntary manslaughter was not warranted by the evidence and hold that the trial court did not abuse its discretion by refusing to provide such an instruction to the jury.

{¶ 51} Appellant also requested an instruction on reckless homicide. Notwithstanding that Appellant did not object at trial to the court's refusal to include an instruction on reckless homicide, his submission of a formal request for the instruction

preserved the issue for appeal.[12]  *See State v. Fine*, 2d Dist. Miami No. 09 CA 00032, 2010-Ohio-2637, ¶ 12-21.

**{¶ 52}** We find that the evidence did not warrant an instruction on reckless homicide.   Herbert Boyd testified that he observed Appellant participating in the fight and "kicking Mr. Hamilton in the head" before the shooting, and that as the fight dissolved, he saw Appellant "standing in the doorway raising a gun up."   Trial Tr. vol. 2, 553-559 and 621.   The fact that Appellant drew his gun as the fight ended, as opposed to diving into the fight with his gun already drawn, suggests that Appellant drew his gun for a purpose, a conscious decision incompatible with the standard for recklessness.[13]   Moreover, a forensic pathologist testified that Joshua died from a "[g]unshot wound [in] the back," which she described as "a contact wound."   *See id.* 452-453 and 460-461.   Inasmuch as the gun must have been pressed against Joshua when it was fired, the nature of the wound suggests that it was inflicted intentionally.   For the foregoing reasons, we hold that the trial court did not abuse its discretion by refusing to instruct the jury on the lesser included offense of reckless homicide.   Appellant's fifth assignment of error is overruled.

**{¶ 53}** For his sixth assignment of error, Appellant contends that:

> THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION IN LIMINE.

**{¶ 54}** Irrespective of the wording of this assignment, Appellant argues that the trial

---

[12] Appellant's defense counsel presumably offered no objection because of a strategic decision to abandon a defense based upon recklessness, in light of the evidence.

[13] The term "recklessly" is defined in the context of an act taken "with heedless indifference to * * * consequences, [and with] disregard[] [of] a substantial and unjustifiable risk that the [act] is likely to cause a certain result or is likely to be of a certain nature."   R.C. 2901.22(C).

court erred by admitting two photographs culled from Facebook in which Appellant appeared to be holding a gun that resembled the gun with which Joshua Hamilton was killed. Trial Tr. vol. 4, 1225-1226; Appellant's Br. 22. These photographs were the subject of Appellant's motion in limine, and Appellant's defense counsel objected to their introduction into evidence during Appellant's trial. Trial Tr. vol. 4, 1226.

{¶ 55} The "admission or exclusion of photographs is governed by Evid.R. 403(A)," pursuant to which evidence deemed relevant under Evid.R. 402 is nonetheless inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A); *State v. Lakes*, 2d Dist. Montgomery No. 21490, 2007-Ohio-325, ¶ 20. When "determining whether the relevance of evidence is outweighed by its prejudicial effects, the evidence [should be] viewed in a light most favorable to [its] proponent * * *." (Citation omitted.) *Id.* An "appellate court will not disturb a trial court's ruling on the admissibility of photos absent an abuse of discretion." (Citation omitted.) *Id.*

{¶ 56} In ruling on Appellant's objection, the trial court determined that the photographs' probative value outweighed their potential to cause unfair prejudice because Appellant's possession of a gun at Kricket's Tavern at the time of the shooting was "[o]ne of the primary issues" in the case, and because they substantiated the account of witnesses regarding the type and the appearance of the gun used in the shooting. *See* Trial Tr. vol. 4, 1229-1231. The court delivered a limiting instruction to the jury after the photographs were introduced. *Id.* at 1242.

{¶ 57} We find that the trial court did not abuse its discretion. Herbert Boyd and Ashley Byrd testified that they saw Appellant in possession of a gun, roughly matching

the gun visible in the photographs, shortly before Joshua Hamilton was shot. Trial Tr. vol. 2, 553-554; Trial Tr. vol. 3, 868-871; Trial Tr. vol. 4, 1229-1231. Even if, under the circumstances, the photographs were redundant, the critical fact—that Appellant had a gun in his possession at Kricket's Tavern on the night of the shooting—was independently established through the testimony of Herbert Boyd and Ashley Byrd. Although Appellant opines that the photographs "made him look violent, familiar with guns, and, to use a slang term, like a 'gangster,' " the significance of the photographs was minimal in comparison to the testimony and other evidence that had already been admitted by that point in the trial, and the court properly cautioned the jury about the purposes for which they could consider the photographs. Appellant's sixth assignment of error is overruled.

{¶ 58} For his final assignment of error, Appellant contends that:

THE TRIAL COURT ERRED IN ALLOWING DETECTIVE FOSNIGHT TO NARRATE HIS PERSONAL OPINION OF THE CONTENTS OF THE BAR SURVEILLANCE TAPE FOR THE JURY OVER OBJECTION.

{¶ 59} Appellant argues that the "contents of the surveillance video[] in this matter were a question of fact for the jury to [decide], not an opportunity for any witness to give [a] personal view of [the video's] contents." Appellant's Br. 24. Specifically, Appellant faults the trial court for permitting Detective Fosnight "to simply narrate his personal opinion of the occurrences in the video * * * for the jury," even "though [the detective] had no specialized or superior knowledge of the [video's] contents." Appellant's Br. 23.

{¶ 60} In his brief, Appellant acknowledges that he could "find no case law on this subject either in support of, or condemning, police narration of a video" created by a third

party.[14]  *Id.*  He argues, instead, that the detective's testimony impermissibly infringed on the jury's role as the trier of fact.  *Id.*  Yet, in light of numerous decisions implicitly approving of testimony of this kind, we cannot say that the trial court abused its discretion by allowing Detective Fosnight to offer testimony in connection with the video.   *See, e.g.*, *State v. Andrews*, 2017-Ohio-1383, ___ N.E.3d ___, ¶ 13-14 (2d Dist.); *State v. Cole*, 2d Dist. Miami No. 2013 CA 18, 2014-Ohio-233, ¶ 23-27; *State v. Harrington*, 4th Dist. Scioto No. 05 CA 3038, 2006-Ohio-4388, ¶ 49-50; *State v. Phillips*, 6th Dist. Lucas No. L-13-1158, 2014-Ohio-4335, ¶ 3; *State v. Arafat*, 8th Dist. Cuyahoga No. 85847, 2006-Ohio-1722, ¶ 122; *State v. Gervais*, 10th Dist. Franklin No. 14AP-652, 2015-Ohio-987, ¶ 6-8; *State v. Barker*, 11th Dist. Portage No. 2013-P-0084, 2014-Ohio-4131, ¶ 78-86. Appellant's seventh assignment of error is overruled.

### III. Conclusion

**{¶ 61}** We hold that the trial court did not err by overruling Appellant's motion to suppress the identifications made by Victor Jefferson and Christopher Nance; by allowing the court's witness to invoke her Fifth Amendment privilege; by overruling his motion under Crim.R. 29; by refusing to instruct the jury on involuntary manslaughter and reckless homicide; by admitting two photographs showing him holding a gun roughly matching witnesses' descriptions of the murder weapon; or by allowing Detective Fosnight to give testimony regarding the surveillance video of the shooting.   As well, we hold that the jury's verdicts were not against the manifest weight of the evidence. Appellant's assignments of error are overruled, and the trial court is affirmed.

---

[14] *But see State v. Arafat*, 8th Dist. Cuyahoga No. 85847, 2006-Ohio-1722, ¶ 122, *and State v. Barker*, 11th Dist. Portage No. 2013-P-0084, 2014-Ohio-4131, ¶ 78-86, both of which appear to be precisely on point, albeit unfavorable to Appellant's argument.

. . . . . . . . . . . . .

HALL, J., concurs.

DONOVAN, J., concurring in judgment only.

Copies mailed to:

Mathias H. Heck, Jr.
Heather N. Jans
Michael J. Scarpelli
Brock A. Schoenlein
Hon. Michael W. Krumholtz